

ENTERED
07/23/2015

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **GREGORY D. HAWK and** | § | **CASE NO. 13-37713** |
| **MARCIE H. HAWK,** | § | |
| | § | |
| Debtors | § | |
| | § | |
| | § | |
| **RES-TX ONE, LLC,** | § | |
| | § | |
| Plaintiff | § | |
| v. | § | **ADVERSARY NO. 14-03191** |
| | § | |
| **GREGORY D. HAWK and** | § | |
| **MARCIE H. HAWK,** | § | |
| | § | |
| Defendants | § | |

**MEMORANDUM OPINION ON RES-TX ONE, LLC'S FIRST AMENDED
COMPLAINT OBJECTING TO THE DEBTORS' DISCHARGE UNDER 11 U.S.C. § 727**
[Doc. No. 23]

## I.   INTRODUCTION

The Court issues this Memorandum Opinion to highlight three points of law: (1) a debtor's fraudulent transfer of property that would have remained exempt if the debtor had kept possession can render that debtor ineligible for discharge under 11 U.S.C. § 727(a)(2); (2) debtors are not required to maintain and produce ancient records in order to obtain their discharge; and (3) one spouse's fraudulent intent may not be automatically imputed to the other spouse.

This Memorandum Opinion resolves creditor Res-TX One, LLC's objection to discharge for Chapter 7 debtors Gregory D. Hawk (Greg Hawk) and Marcie H. Hawk (Marcie Hawk). Res-TX One (Res-TX) alleges that the Hawks violated 11 U.S.C. § 727 by (1) using a business

entity to shield assets from creditors; (2) failing to provide sufficient financial records to the trustee; (3) making misrepresentations on their Statement of Financial Affairs and Schedules; and (4) failing to explain the disappearance of assets.

The Court finds that Res-TX has met its burden of proof as to the first and third challenges with regard to Greg Hawk; therefore, Greg Hawk will be denied a discharge. The Court finds that Res-TX has failed to meet its burden of proof as to any of the challenges with regard to Marcie Hawk; therefore, Marcie Hawk will be granted a discharge.

## II.   PROCEDURAL BACKGROUND

1.   Greg Hawk and Marcie Hawk (collectively, the Debtors), who are currently engaged in divorce proceedings, filed a petition for Chapter 7 bankruptcy on December 15, 2013 (the Petition Date). [Main Case Doc. No. 1].[1] Eva Engelhart was appointed to be the Chapter 7 Trustee (the Trustee) in the Debtors' case. [Main Case Doc. No. 7].

2.   On or about August 29, 2011, Res-TX obtained a judgment in Texas state court against the Debtors, jointly and severally, for the principal amount of $1,579,402.83, per diem interest in the amount of $378.75 from August 29, 2011 until the debt is satisfied, and attorney's fees and costs totaling $108,039.48.   [Doc. No. 23, ¶ 10]; [Doc. No. 26, ¶ 10].

3.   The Debtors listed the Res-TX judgment as an undisputed, unsecured debt of $2,013,339.14 on both their original and their amended Schedule D.   [Main Case Doc. No. 18, p. 18]; [Main Case Doc. No. 43, p. 4].

4.   On April 3, 2014, the Trustee filed a Report of No Distribution in the Debtors' case, declaring that there was no property of the estate to distribute amongst creditors and

---

[1] All citations to docket numbers in this Memorandum Opinion are citations to the docket sheet for the instant adversary proceeding, not the main bankruptcy case, unless otherwise specified.

therefore that the estate had been fully administered.  [Main Case Minutes for Apr. 3, 2014].

5.    On May 16, 2014, Res-TX filed its initial Complaint Objecting to the Debtors' Discharge Under 11 U.S.C. § 727, initiating the instant adversary proceeding.  [Doc. No. 1].   On July 17, 2014, the Debtors filed the Motion to Dismiss Plaintiff's Complaint Pursuant to Rule 12(b) (the Motion to Dismiss).   [Doc. No. 8].   On September 3, 2014, this Court denied in part and carried in part the Motion to Dismiss.  [Doc. No. 21].

6.    On September 30, 2014, Res-TX filed the First Amended Complaint Objecting to the Debtors' Discharge Under 11 U.S.C. § 727 (the Objection), which is the "live" pleading that Res-TX prosecuted at trial.  [Doc. No. 23].  On October 13, 2014, the Debtors filed the Defendants' First Amended Answer, [Doc. No. 26], and on October 22, 2014, this Court denied the remainder of the Motion to Dismiss, [Doc. No. 28].

7.    On February 6, 2015, the parties filed their Joint Pretrial Statement.   [Doc. No. 36].  The Court held the trial in this adversary proceeding on February 17, 2015, February 18, 2015, and February 24, 2015.

8.    On February 9, 2015, Res-TX filed a proof of claim in the amount of $1,995,443.19 in the Debtors' main case, claiming the principal amount of the judgment, accrued unpaid interest through the day prior to the Petition Date, and the attorneys' fees.  [Main Case Claim No. 9].   No objection to Res-TX's claim has been filed; therefore, Res-TX's claim is deemed allowed.  11 U.S.C. § 502(a).

9.    On March 10, 2015, both parties filed post-trial briefs.  [Doc. Nos. 46 & 47].   The Court subsequently held a hearing on April 7, 2015 to give the parties an opportunity

for post-brief arguments.  No further arguments were made, and the Court took the matter under advisement.

## III.    SUMMARY OF ALLEGATIONS

Res-TX alleges that the Debtors are ineligible for discharge under 11 U.S.C. § 727, the section of the United States Bankruptcy Code providing for discharge in Chapter 7.[2]  Res-TX makes four separate allegations under four subsections of § 727(a), as follows:

1. Res-TX alleges that the Debtors violated § 727(a)(2), which disqualifies from discharge a debtor who has "with intent to hinder, delay, or defraud a creditor . . . transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition."  Specifically, Res-TX alleges that within one year of the Petition Date, the Debtors liquidated IRAs (exempt from attachment under Texas law) into an account under their control, but not under their names, in order to avoid garnishment. [Doc. No. 23, ¶¶ 12 & 15].

2. Res-TX alleges that the Debtors violated § 727(a)(3), which disqualifies from discharge a debtor who has "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained unless such act or failure to act was justified under all of the circumstances of the case."  Specifically, Res-TX alleges that the Debtors, in late 2007, liquidated a captive insurance company of their primary business, a home-building company, transferred the resulting sum of $6,482,003.23 to themselves, and failed to preserve records showing the ultimate disposition of this sum. [Doc. No. 23, ¶¶ 13 & 16].

---

[2] Any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, unless otherwise noted.

4

3.  Res-TX alleges that the Debtors violated § 727(a)(4), which disqualifies from discharge a debtor who has "knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." Specifically, Res-TX alleges that the Debtors made the following omissions and misstatements: (1) On their Schedule B, the Debtors misleadingly listed a personal bank account under "other personal property" instead of under "[c]hecking, savings, or other financial accounts"; and (2) On their Statement of Financial Affairs, the Debtors failed to list certain payments to creditors made within 90 days of the Petition Date. [Doc. No. 46, pp. 12–14].

4.  Res-TX alleges that the Debtors violated § 727(a)(5), which disqualifies from discharge a debtor who has "failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets." Specifically, Res-TX alleges that the Debtors failed to account for the ultimate disposition of funds that were liquidated from the captive insurance company in late 2007. [Doc. No. 23, ¶ 18]; [Doc. No. 46, pp. 14–16].

## IV.  JURISDICTION, VENUE, AND CONSTITUTIONAL AUTHORITY TO ENTER A FINAL JUDGMENT

### A. Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b). 28 U.S.C. § 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 [the Bankruptcy Code], or arising in or related to cases under title 11." District courts may, in turn, refer these proceedings to the bankruptcy judges for that district. 28 U.S.C. § 157(a). In the Southern District of Texas, General Order 2012-6 (entitled General Order of Reference) automatically refers all eligible cases and proceedings to the bankruptcy courts.

"Congress used the phrase 'arising under title 11' to describe those proceedings that involve a cause of action created or determined by a statutory provision of title 11." *Matter of Wood*, 825 F.2d 90, 96 (5th Cir. 1987). Here, Res-TX's cause of action—its objection to the Debtors' discharge—is created by § 727. Consequently, it is within federal district court jurisdiction pursuant to 28 U.S.C. § 1334(b) and has been appropriately referred to this Bankruptcy Court under General Order 2012-6.

### B. Venue

28 U.S.C. § 1409(a) provides that "a proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending." The Debtors' main bankruptcy case is presently pending in the Southern District of Texas; therefore, venue of this adversary proceeding in the Southern District of Texas is proper.

### C. Constitutional Authority to Enter a Final Judgment

In the wake of the Supreme Court's ruling in *Stern v. Marshall*, 131 S.Ct. 2594 (2011), this Court must also evaluate whether it has the constitutional authority to enter a final judgment adjudicating the dispute at bar. In *Stern,* the Supreme Court held that 28 U.S.C. § 157(b)(2)(C)—which authorizes bankruptcy judges to issue final judgments in counterclaims by a debtor's estate against entities filing claims against the estate—is an unconstitutional delegation of Article III authority to bankruptcy judges, at least when the dispute being adjudicated is based on state common law and does not affect the claims adjudication process. *Id.* at 2616. However, *Stern* affirmed the "public rights exception" to unconstitutional delegation, which holds that Article I judges may finally decide issues that "flow from a federal statutory scheme" or are "completely dependent upon adjudication of a claim created by federal law." *Id.* at 2598 (internal citations omitted).

6

The dispute at bar is not a counterclaim of the Debtors, nor does it arise out of state law. Rather, the dispute arises entirely out of § 727, which prescribes the circumstances under which Chapter 7 debtors are entitled to discharge. State law has no equivalent to this provision; it is purely a creature of the Code. The dispute at bar both "flows from a federal statutory scheme" and is "completely dependent upon adjudication of a claim created by federal law," as it concerns only the federal privilege of discharge in bankruptcy. Accordingly, this Court has the constitutional authority to enter a final judgment.

Alternatively, this Court has the constitutional authority to enter a final judgment because the parties have consented to adjudication by this Court. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1939 (2015). Indeed, Res-TX chose to file the Objection in this Court, the Debtors filed their answer in this Court, and the parties proceeded to introduce evidence at trial without ever objecting to this Court's constitutional authority to enter a final judgment. In their Joint Pretrial Statement, the parties expressly stated that:

> This case involves no counterclaim against Res-TX One which arises under any nonbankruptcy law; therefore, the Constitutional prohibition of this Court making final orders arising out of any such counterclaims is not implicated. Moreover, the claims brought in this adversary proceeding arise only under the Bankruptcy Code—such relief is not available in any state court. Therefore *Stern* does not apply, and this Court is constitutionally authorized to enter a final judgment regarding the disputes at bar.

[Doc. No. 36, pp. 2–3] (internal citation omitted). If these circumstances do not constitute consent, nothing does.

## V.    FINDINGS OF FACT[3]

1.  When the Debtors filed bankruptcy on December 15, 2013, Greg Hawk was primarily self-employed, while Marcie Hawk was employed with Atlantic Southeast Airlines. [Main Case Doc. No. 30, p. 1].

2.  The Debtors filed their original Statement of Financial Affairs (SOFA) and Schedules on January 7, 2014. [Main Case Doc. Nos. 18 & 19]. They filed an amended SOFA and an amended Schedule B (the Schedule on which debtors list personal property) on February 10, 2014. [Main Case Doc. Nos. 29 & 30].

3.  The Debtors' primary business during the 2000s had been Supreme Builders, Ltd. (Supreme). [Testimony of Stewart Feldman, Feb. 24, 2015, at 2:48 p.m.]. Supreme was a home construction company chartered in June 2001. [Main Case Doc. No. 30, p. 8]. Supreme built homes targeted towards first-time homebuyers. [Testimony of Stewart Feldman, Feb. 24, 2015, at 2:48–2:49 p.m.].

4.  The Debtors were experiencing financial difficulties at least by April 2006, when they took out a home equity loan. [Defs.' Ex. No. 53]; [Testimony of Marcie Hawk, Feb. 17, 2015, at 3:11–3:15 p.m.]. Because first-time homebuyers are more likely to be credit-impaired than the general population of homebuyers, Supreme was hit hard by the subprime mortgage crisis beginning in 2007. [Testimony of Stewart Feldman, Feb. 24, 2015, at 2:54–2:55 p.m.]. Supreme forfeited its corporate privileges due to nonpayment of taxes in July 2010. [Main Case Doc. No. 30, p. 8].

5.  Although Supreme was the Debtors' primary business, they controlled, managed, or had another significant interest in 17 related entities in the six years prior to their

---

[3] The Court makes its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such. Moreover, to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such.

bankruptcy filing.  [Main Case Doc. No. 30, pp. 8–9].  Most relevant to the instant proceeding are (1) two captive insurance companies that the Debtors formed under British Virgin Islands law, and (2) Tejas Services, LLC (Tejas), a Texas company formed to provide lawn care services for Supreme.  [Main Case Doc. No. 30, p. 8]; [Testimony of Greg Hawk, Feb. 17, 2015, at 10:06 a.m.].

6.  Tejas is nominally owned by Greg Hawk's parents, Duane and Judy Hawk.  [Testimony of Greg Hawk, Feb. 17, 2015, at 10:06 a.m.].  Neither Duane nor Judy Hawk is listed on Tejas's Certificate of Formation, which names Greg Hawk as "Manager."  [Pl.'s Ex. No. 33].

7.  Tejas has a bank account at First National Bank titled "Tejas Services LLC c/o Duane and Judy Hawk Irrv Tr 09/17" (the Tejas Account).  [Pl.'s Ex. No. 50].  Greg Hawk testified that he used the Tejas Account as a personal bank account.  [Testimony of Greg Hawk, Feb. 17, 2015, at 4:15–4:16 p.m.].  Neither the Debtors' original Schedule B nor their amended Schedule B listed the Tejas Account under "[c]hecking, savings, or other financial accounts."  [Main Case Doc. No. 18, p. 4]; [Main Case Doc. No. 29, p. 1].  Rather, they listed the Tejas Account under "other personal property," where it was disclosed that:

> Debtor has no membership interest in Tejas Services, LLC, but serves as the Manager.  Debtor uses this checking account as his personal checking account.  See SOFA, Section 14 for additional information.

[Main Case Doc. No. 18, p. 10]; [Main Case Doc. No. 29, p. 7].  Section 14 of the Debtors' SOFA (in both the original and amended versions), entitled "Property held for another person," lists the Tejas Account as property of Tejas that the Debtors hold or control.  [Main Case Doc. No. 19, pp. 5–6]; [Main Case Doc. No. 30, pp. 5–6].

8.     The last page of both the original Schedule B and the amended Schedule B is signed by

both Debtors under the affirmation: "I declare under penalty of perjury that I have read

the foregoing summary and schedules . . . , and that they are true and correct to the best

of my knowledge, information, and belief." [Main Case Doc. No. 18, p. 47]; [Main

Case Doc. No. 29, p. 8].  The last page of both SOFAs is signed by both Debtors under

the affirmation: "I declare under penalty of perjury that I have read the answers

contained in the foregoing statement of financial affairs and any attachments thereto

and that they are true and correct." [Main Case Doc. No. 19, p. 10]; [Main Case Doc.

No. 30, p. 11].

9.     Both the original SOFA and the amended SOFA also disclose transfers that the Debtors

made to the Tejas Account prior to the Petition Date (December 15, 2013), stating:

> During 2011, the Debtor [sic] transferred funds from a 529(a) college
> savings account and from 401K accounts to Tejas Services.  The Debtor
> [sic] then withdrew the same funds to pay debts and household expenses.
> Amount transferred during 2012 = $267,656.00
> Amount transferred during 2013 = $175,068.00

[Main Case Doc. No. 19, p. 5]; [Main Case Doc. No. 30, p. 5].

10.    Greg Hawk, specifically, transferred $11,987.55 from his IRA to the Tejas Account on

February 5, 2013—within one year of the Petition Date.  [Pl.'s Ex. No. 20, p. 1290];

[Pl.'s Ex. No. 30, p. 208]; [Testimony of Greg Hawk, Feb. 17, 2015, at 10:16–10:17

a.m.].  On December 11, 2013—just four days before the Petition Date—Greg Hawk

transferred an additional $8,986.50 from his IRA into the Tejas Account.  [Pl.'s Ex. No.

20, p. 1929]; [Testimony of Greg Hawk, Feb. 17, 2015, at 11:06 a.m.].  There was no

evidence of any consideration given by Tejas for these transfers.

11.    Greg Hawk testified that he decided that the couple should liquidate IRAs into the
Tejas Account, instead of into personal accounts, in order to protect the funds from
garnishment by creditors. [Testimony of Greg Hawk, Feb. 17, 2015, at 10:19 a.m.]. At
the time of the February 5, 2013 and December 11, 2013 transfers, Greg Hawk's
personal bank account had been garnished by a creditor. [*Id.* at 10:18 a.m.].

12.    Marcie Hawk, specifically, transferred $25,000 from her IRA to the Tejas Account on
October 10, 2012. [Pl.'s Ex. 20, pp. 2139–41]. Marcie Hawk testified that she "did not
handle any of the money in [the Hawk] home." [Testimony of Marcie Hawk, Feb. 17,
2015, at 2:45 p.m.]. Marcie Hawk also testified that she was aware that she had IRAs
that were being liquidated as the couple's financial condition deteriorated, and that she
signed distribution forms at Greg Hawk's instruction. [*Id.* at 2:49–2:50 p.m.]. Marcie
Hawk further testified, however, that she did not know about the Tejas Account when
the October 10, 2012 transfer was made, because she "didn't read anything and just
signed." [*Id.* at 2:51–2:52 p.m.]. She testified that she knew the funds were not going
into her personal account, but instead to an account Greg Hawk would use to pay the
bills, and she did not question the propriety of that because Greg Hawk managed all the
bills for the household. [*Id.* at 2:52 p.m.]. Marcie Hawk testified that the handwriting
on the distribution form directing the cash to the Tejas Account was Greg Hawk's
handwriting. [*Id.* at 3:01 p.m.].

13.    Marcie Hawk testified that she knew about Tejas and knew that it had a bank account.
[*Id.* at 2:56 p.m.]. She also knew that Tejas was a separate entity involved with lawn
care that Greg Hawk performed. [*Id.* at 2:57–2:58 p.m.]. She testified that she had no
knowledge of Tejas beyond that. [*Id.* at 2:58 p.m.]. Marcie Hawk testified that she had

minimal involvement with Supreme, mostly limited to staging homes. [*Id.* at 3:07–3:10 p.m.]. She testified that she never made any financial decisions regarding Supreme, never attended a business meeting, never worked in the office, and was never an officer or director. [*Id.* at 3:10 p.m.].

14. Greg Hawk testified that he used the Tejas Account for three general purposes: (1) to make payments on mortgage loans; (2) to pay general household expenditures; and (3) to pay off a Barclays credit card. [Testimony of Greg Hawk, Feb. 17, 2015, at 11:30 a.m.–12:10 p.m.]. Payments to Barclays for the credit card totaled $23,238.12 in the year leading up to the Petition Date, or approximately $1,900 per month.[4] Greg Hawk testified that he used the Barclays card for general household expenditures. [*Id.* at 4:24 p.m.]. Marcie Hawk testified that she did not use the Barclays card to her knowledge, but that it is possible Greg Hawk gave her the card to use for a specific purpose. [Testimony of Marcie Hawk, Feb. 17, 2015, at 2:55–2:56 p.m.]. No credit card statements for the Barclays card were submitted to this Court.

15. In addition to expenses he made directly from the Tejas Account, Greg Hawk repeatedly withdrew large sums of cash. For example, between March 13, 2014 and July 14, 2014, Greg Hawk wrote four checks from the Tejas Account that were each in the amount of $9,900 and made payable to "cash." [Pl.'s Ex. No. 30, p. 134]; [Testimony of Greg Hawk, Feb. 17, 2015, at 11:08 a.m.]. Greg Hawk testified that he wrote these four checks because he "needed to pay bills." [Testimony of Greg Hawk, Feb. 17, 2015, at 11:08–11:10 a.m.].

---

[4] $1,936.51 per month precisely, as calculated from the following payments: 1/14/13–$450.00; 2/08/13–$1,837.54; 3/05/13–$2,212.41; 4/15/13–$1,500.00; 5/03/13–$2,000.00; 6/13/13–$1,214.35; 7/15/13–$1,392.83; 8/13/13–$2,472.65; 9/13/13–$3,199.77; 10/15/13–$2,540.85; 11/13/13–$2,500.00; 12/13/13–$1,917.72. [Pl.'s Ex. 30, pp. 204–289].

16.     The two captive insurance companies—so called because they were created specifically and exclusively to insure Supreme—were Homestake Property & Casualty Insurance Corporation (Homestake), and BuildersRisk Property & Casualty Insurance Corporation (BuildersRisk). [Testimony of Stewart Feldman, Feb. 24, 2015, at 2:46–2:51 p.m.]. [Doc. No. 23, ¶ 13]; [Doc. No. 26, ¶ 13].[5] Greg Hawk was president of Homestake and Marcie Hawk was president of BuildersRisk. [Defs.' Ex. No. 20]. Greg Hawk and Marcie Hawk were both directors of Homestake. [Defs.' Ex. No. 11].

17.     BuildersRisk was merged into Homestake in 2006. [Defs.' Ex. No. 20]. On November 20, 2007, $251,000 was transferred out of Homestake's bank account. [Pl.'s Ex. No. 22]. By December 19, 2007, Homestake, which at that point had total assets of $6,482,003.23, was liquidated into holding companies owned by the Hawks. [Defs.' Ex. No. 13]; [Doc. No. 23, ¶ 13]; [Doc. No. 26, ¶ 13].

18.     The Trustee, after the initial meeting of creditors, requested documents from the Debtors in an attempt to determine how the assets liquidated from the captive insurance companies were eventually expended. [Testimony of Eva Engelhart, Feb. 17, 2015, at 9:21–9:22 a.m.]. In response, the Debtors produced three large and disorganized boxes of documents, but the Trustee was unable to determine how the assets were disposed of from those documents. [*Id.* at 9:21–9:22 a.m.].

19.     In the Objection, Res-TX complains that the Debtors should be denied discharge under § 727(a)(5) because they failed to sufficiently explain disposition of the $6,482,003.23 liquidated from the captive insurance companies. At trial, Greg Hawk testified that he

---

[5] This Court refers to the captive insurance companies by the full names used in the pleadings and exhibits, which differ slightly from the full names as listed on the amended SOFA. [*See* Main Case Doc. No. 30, pp. 8–9] (referring to Homestake as "Homestead Property & Casualty Corp." and to BuildersRisk as "Builders Risk Property & Casualty Company").

decided to liquidate Homestake in order to sustain Supreme. [Testimony of Greg Hawk, Feb. 17, 2015, at 12:37–12:38 a.m.]. The Debtors' former attorney, Stewart Feldman, credibly testified that when Homestake was liquidated, the resulting $6,482,003.23 was distributed (1) from Homestake to the holding companies owned by the Debtors; (2) from the holding companies to the Debtors individually; and (3) from the Debtors to Supreme as a capital contribution. [Testimony of Stewart Feldman, Feb. 24, 2015, at 2:50–3:03 p.m.]; [Defs.' Ex. No. 19].

20. On October 10, 2013, i.e. within 90 days before the Petition Date, Greg Hawk paid his brother $5,000 by check. [Pl.'s Ex. No. 30, p. 128]. Greg Hawk testified that this check was repayment of a loan from his brother. [Testimony of Greg Hawk, Feb. 17, 2015, at 11:15 a.m.]. When first questioned, Greg Hawk testified that he could not remember why he had borrowed money from his brother. [*Id.*]. Later, he testified that his brother had paid for a truck for Greg Hawk's daughter, fuel injectors and tires, appraisal software, and attorney's fees. [Testimony of Greg Hawk, Feb. 18, 2015, at 10:19–10:20 a.m.].

21. On November 13, 2013, also within 90 days of the Petition Date, Greg Hawk paid a $2,500 credit card bill to Barclays. [Pl.'s Ex. No. 30, p. 281].

22. The Debtors did not disclose either the $5,000 loan repayment or the $2,500 credit card payment under Section 3 of either their original or their amended SOFA, which instructs individual debtors with primarily consumer debts[6] to "[l]ist all payments on loans, installment purchases of goods or services, and other debts to any creditor made within 90 DAYS immediately preceding the commencement of this case unless the

---

[6] There is no question that Greg Hawk and Marcie Hawk are "individual debtors with primarily consumer debts." Indeed, on their Chapter 7 petition, they expressly indicated that their debts "are primarily consumer debts" by checking off the appropriate box under the subsection entitled "Nature of Debts." [Main Case Doc. No. 1, p. 1].

aggregate value of all property that constitutes or is affected by such transfer is less than $600." [Main Case Doc. No. 19, p. 1];[Main Case Doc. No. 30, p. 1]. Instead, the Debtors checked the box marked "none." [Main Case Doc. No. 19, p. 1]; [Main Case Doc. No. 30, p. 1].

## VI.   CONCLUSIONS OF LAW

### A. Greg Hawk's pre-petition transfer of funds from exempt accounts to a corporate account in Tejas's name constitutes a violation of § 727(a)(2).

Section 727(a)(2) denies discharge to a debtor who has (1) "transferred, removed, destroyed, mutilated, or concealed" (2) "property of the debtor" (3) "within one year before the date of the filing of the petition" (4) "with intent to hinder, delay, or defraud a creditor." Here, the only contested element is intent, as the Debtors disclosed on their SOFA, [Finding of Fact No. 9], and admitted in the Joint Pretrial Statement, [Doc. No. 36, p. 6], that they had transferred their property to the Tejas Account within one year before the Petition Date. Even without these admissions, there would be sufficient evidence to establish that Greg Hawk "transferred" "property of the debtor" (i.e. money from his IRA) to the Tejas Account "within one year before the date of the filing of the petition" (i.e. on February 5, 2013 and on December 11, 2013). [Finding of Fact No. 10]. Because this Court finds that Greg Hawk transferred funds to the Tejas Account with the intent of hindering creditor collection efforts, the Court finds that he should be denied discharge pursuant to § 727(a)(2).

#### 1.  Greg Hawk's actions evidence the requisite intent to "hinder, delay, or defraud a creditor."

"[I]ntent to hinder or delay" means "an intent to improperly make it more difficult for creditors to reasonably collect on their debts." *In re Womble*, 289 B.R. 836, 854 (Bankr. N.D. Tex.), *aff'd sub nom. Womble v. Pher Partners*, 299 B.R. 810 (N.D. Tex. 2003), *aff'd sub nom.*

*In re Womble*, 108 F. App'x 993 (5th Cir. 2004). To deny a debtor's discharge under §

727(a)(2), a court must find that the debtor had actual intent to defraud creditors; constructive

intent is not sufficient. *Matter of Chastant*, 873 F.2d 89, 91 (5th Cir. 1989). However, actual

intent may be inferred from the debtor's course of conduct. *Id.* Factors courts consider in

assessing a debtor's intent in transferring assets are:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close
> associate relationship between the parties; (3) the retention of possession, benefit,
> or use of the property in question; (4) the financial condition of the party sought
> to be charged both before and after the transaction in question; (5) the existence or
> cumulative effect of the pattern or series of transactions or course of conduct after
> the incurring of debt, onset of financial difficulties, or pendency or threat of suits
> by creditors; and (6) the general chronology of the events and transactions under
> inquiry.

*In re Dennis*, 330 F.3d 696, 702 (5th Cir. 2003). One of these factors may be sufficient on its

own; several factors is a strong indication of fraudulent intent. *Womble*, 289 B.R. at 854.

Courts have found sufficient evidence of intent to hinder or delay when a debtor transfers

assets shortly before bankruptcy to bank accounts that are "difficult to connect with the debtor."

*Id.* A debtor who admits he transferred assets out of concern that the assets would otherwise be

seized has "all but admitted that he transferred the funds . . . with the intent to hinder." *In re

Wells*, 426 B.R. 579, 591 (Bankr. N.D. Tex. 2006). In *Wells*, the debtor purchased a cashier's

check in the name of his 14-year-old son, which he used for a down payment on a home. *Id.* at

590. The debtor had testified that he was concerned that funds in the account on which he drew

the check were at risk of attachment, and that he put the check in his son's name because he did

not obtain a clear answer from the bank regarding this risk. *Id.* In denying the debtor's

discharge under § 727(a)(2), the court placed the most weight on the debtor's testimony, but also

considered the facts that the transfer to the son was made without consideration, that the debtor

retained control of the funds, and that the debtor was in poor financial condition when the transfer was made. *Id.* at 591.

Here, there is sufficient evidence to find that Greg Hawk transferred his property to the Tejas Account within one year of the Petition Date with the intent to hinder creditors. As with the debtor in *Wells*, Greg Hawk "all but admitted" that he had the actual intent to hinder. Specifically, he admitted that he (1) transferred to the Tejas Account (2) funds from his IRA (3) within one year of the Petition Date (4) specifically because the Tejas Account was not subject to attachment, unlike his personal bank account, which had already been garnished by creditors. [Findings of Fact Nos. 10 & 11]. His admission that he transferred the IRA funds to the Tejas Account in order to avoid garnishment establishes "an intent to improperly make it more difficult for creditors to reasonably collect on their debt." *See Womble*, 289 B.R. at 854. Therefore, Greg Hawk's testimony alone establishes all the elements of § 727(a)(2).

Alternatively, even if Greg Hawk had not testified so clearly that he made the transfers to avoid garnishment, an analysis of the *Dennis* factors clearly establishes the requisite fraudulent intent. *See Womble*, 289 B.R. at 836. In *Womble*, the debtor transferred more than $20,000 to two companies that he effectively owned and controlled approximately one month before the relevant bankruptcy filing. *Id.* at 844, 854. The court considered the *Dennis* factors to determine that the debtor had the requisite fraudulent intent: (1) the debtor had introduced no evidence of consideration; (2) the debtor had a close relationship with the businesses; (3) the debtor controlled the businesses; (4) the debtor was in poor financial condition at the time of the transfer; (5) a creditor was attempting to collect when the transfer occurred; and (6) the transfer occurred immediately prior to the bankruptcy filing. *Id.* at 853–55.

Here, application of the *Dennis* factors likewise shows Greg Hawk's fraudulent intent. First, there was no evidence of any consideration given by Tejas for the February 5, 2013 transfer of $11,987.55, the December 11, 2013 transfer of $8,986.50, or any other transfers to the Tejas Account that contributed to the $175,068.00 that was reported on the SOFA as transferred in 2013. [Findings of Fact Nos. 9 & 10]. In fact, all the evidence indicates that Tejas was a defunct entity and that the Tejas Account belonged to Tejas in name only, and in actuality to Greg Hawk. [Findings of Fact Nos. 5–14]. Second, Tejas was nominally owned by Greg Hawk's close relatives—his parents. [Finding of Fact No. 6]. Third, Greg Hawk was in full control of the Tejas Account, as he was the manager of Tejas. [*Id.*]. Fourth, creditors were garnishing the Debtors' assets by 2011, well before the transfers. [Testimony of Greg Hawk, Feb. 17, 2015, at 4:22 p.m.]. Had the Debtors transferred the assets to an account that was easily identifiable with them, Res-TX could have reached it. Finally, it is beyond doubt that the Debtors were in dire financial straits when the transfers were made. [Finding of Fact No. 4]. Thus, the *Dennis* factors establish Greg Hawk's intent to defraud his creditors. Consequently, Res-TX has satisfied all four elements required to deny discharge to Greg Hawk under § 727(a)(2).

### 2. The fact that the property transferred was exempt under state law does not prove that Greg Hawk lacked fraudulent intent.

The fact that the funds transferred were initially exempt does not prove that Greg Hawk lacked fraudulent intent. *See Tavenner v. Smoot*, 257 F.3d 401, 406 (4th Cir. 2001). In *Tavenner*, the Fourth Circuit affirmed that the debtor had fraudulent intent in transferring settlement proceeds that would otherwise have been exempt under state law. *Id.* The Fourth Circuit reasoned that the Code assumes the possibility that a debtor could fraudulently transfer exempt property under § 522(g), which provides that a debtor may exempt property recovered by

18

a trustee only if the transfer had been involuntary and the debtor had not intended to conceal the transfer. *Id.* By inverse reasoning, a debtor may *not* exempt property recovered by a trustee that the debtor had voluntarily transferred with fraudulent intent. In order to give full meaning to § 522(g), therefore, it must necessarily be possible for a trustee to recover potentially exempt property that a debtor had voluntarily transferred. *Id.* Thus, in *Tavenner*, finding that the debtor had fraudulent intent in transferring the settlement proceeds, the Fourth Circuit denied both the debtor's discharge under § 727 and held that the trustee could avoid the transfer. *Id.* at 409.

Some courts have nonetheless held that transfers of exempt property cannot evidence fraudulent intent. *Matter of Agnew*, 818 F.2d 1284, 1289–90 (7th Cir. 1987); *In re Short*, 188 B.R. 857, 860 (Bankr. M.D. Fla. 1995). However, these cases are distinguishable because they involved situations in which the property at issue was exempt both before and after the transfer. *Agnew*, 818 F.2d at 1290; *Short*, 188 B.R. at 860. Specifically, both *Agnew* and *Short* involved transfers by a debtor of the family homestead to the debtor's spouse individually. *Agnew*, 818 F.2d at 1286; *Short*, 188 B.R. at 859. Reasoning that the respective creditors could not have reached the property in any case because it remained exempt both before and after being transferred, the courts ruled that the debtors could not have had fraudulent intent. *Agnew*, 818 F.2d at 1290; *Short*, 188 B.R. at 860.

Unlike in *Agnew* and *Short*, Greg Hawk did not retain his right to an exemption after the relevant transfers. Therefore, the reasoning of *Agnew* and *Short* does not apply to bar application of § 727(a)(2) in the instant proceeding. In contrast to the homesteads at issue in *Agnew* and *Short*, the IRAs here lost their exempt status when they were liquidated to pay the Debtors' expenses (as opposed to being rolled over to another exempt account). Tex. Prop. Code Ann. § 42.0021(c) (West) (specifying that only amounts rolled over into another exempt account remain

exempt after distribution); *see also In re Hawk*, 524 B.R. 706, 714 (Bankr. S.D. Tex. 2015). Therefore, *Agnew* and *Short* do not apply to the facts at bar.

The Fifth Circuit has never expressly ruled that a transfer of exempt property cannot be a basis for denying discharge under § 727(a)(2). However, it has echoed the reasoning of *Agnew* and *Short* in suggesting that exempt property may not be subject to fraudulent conveyance law. *Matter of Moody*, 862 F.2d 1194, 1199 (5th Cir. 1989) ("Because creditors have no right to recovery against a debtor's homestead in the first instance, a conveyance of the homestead cannot be in fraud of their rights as creditors."). Nevertheless, the actual holding of *Moody* was narrow—that the debtor, who had nominally transferred his homestead while constantly maintaining the intent required for homestead designation, could not be denied the homestead protections guaranteed by the Texas constitution. *Id.* at 1197. The Fifth Circuit explained that the debtor's "numerous transactions clearly indicate a fraudulent intent to impair creditors"; however, the debtor had "at all times . . . intended to keep his property as his homestead." *Id.* Therefore, the Fifth Circuit ruled that the debtor was "entitled to his homestead exemption as a matter of right under Texas law." *Id.* Consequently, *Moody* is limited to the same facts that cabin the holdings of *Agnew* and *Short*—the property remained exempt both before and after the transfer.

Furthermore, the Fifth Circuit has emphasized that a debtor acting with intent to defraud can be denied discharge even if he retains his right to an exemption. *See Matter of Reed*, 700 F.2d 986, 990–91 (5th Cir. 1983). In *Reed*, the Fifth Circuit held that although the mere act of converting non-exempt property to exempt property on the eve of bankruptcy would not disqualify a debtor from discharge, discharge would be denied if the debtor converted the property with proven fraudulent intent. *Id.* at 990. While debtors are entitled to convert non-

20

exempt property to exempt property in order to protect their assets from creditors ("which is, after all, the function of an exemption"), debtors who do so deceitfully may still be denied discharge. *Id.* In *Reed*, the Fifth Circuit found that the debtor's course of conduct was sufficient to establish fraudulent intent: there, the debtor had taken out a loan shortly before bankruptcy, which he used to purchase guns and antiques. *Id.* at 988–89. He then quickly re-sold these valuables for less than market value to acquaintances, applying the proceeds to his home mortgage debt. *Id.* at 989. Finally, he opened a secret bank account where he began depositing his income, which he used to repay the loan. *Id.* The Fifth Circuit found that the multitude of steps involved in converting non-exempt to exempt property on those facts evidenced an intent to deceive. *Id.* at 991–92. Moreover, the debtor's right to an exemption did not excuse this intent:

> While the Code requires that, when the debtor claims a state-created exemption, the scope of the claim is determined by state law, it sets separate standards for determining whether the debtor shall be denied a discharge. The debtor's entitlement to a discharge must, therefore, be determined by federal, not state, law. In this respect, *11 U.S.C. § 727(a)(2) is absolute: the discharge shall be denied a debtor who has transferred property with intent to defraud his creditors.*

*Id.* at 991 (emphasis added). Consequently, the debtor was denied a discharge, but retained the benefit of the homestead exemption. *Id.* at 992.

In the proceeding at bar, the evidence is sufficient to show that Greg Hawk had fraudulent intent in transferring funds to the Tejas Account, and the fact that the funds were transferred from exempt accounts does not change this result.

### 3. The fact that many of the funds in the Tejas Account were used for ordinary household expenses is not relevant to the elements of § 727(a)(2).

The Debtors argue that Greg Hawk's use of the Tejas Account for routine expenditures proves that he lacked the requisite fraudulent intent under § 727(a)(2). [Doc. No. 47, pp. 16–17]. This argument is fallacious. The transfers of funds to the Tejas Account within one year of the

Petition Date are the fraudulent transfers under § 727(a)(2), not the subsequent transfers of the funds out of the Tejas Account. As discussed *supra*, secs. VI.A.1 & 2, those initial transfers satisfy the elements of § 727(a)(2). The fact that Greg Hawk intended to hinder lawful attachments to the funds is sufficient to satisfy the intent element, regardless of how the funds were thereafter spent.

To hold otherwise would confuse the purpose of exemption law. Only cash set aside for specifically defined purposes is exempt. *See Clark v. Rameker*, 134 S. Ct. 2242, 2246 (2014) ("Section 522(b)(3)(C)'s reference to 'retirement funds' is . . . properly understood to mean sums of money set aside for the day an individual stops working."). Exempting retirement accounts comports with "the important purpose of . . . helping to ensure that debtors will be able to meet their basic needs during their retirement years." *Id.* at 2247 (internal quotation omitted). Therefore, the Debtors' argument—that Greg Hawk's use of Tejas Account funds for living expenses proves his lack of fraudulent intent—misconstrues the very purpose of the exemption laws. Greg Hawk actually intended to hinder attachment by creditors when he transferred IRA funds to the Tejas Account, *see supra* secs. VI.A.1 & 2, and his subsequent use of the funds does not change this intent.

Finally, even if Greg Hawk's quotidian expenditures somehow saved him from § 727(a)(2), this Court does not find his testimony credible on that issue. First, he has failed to account for the Barclays credit card payments, which amounted to approximately $1,900 per month. [Finding of Fact No. 14]. Second, in addition to the payments on which Greg Hawk focused in his testimony, he withdrew large sums of cash from the Tejas Account; indeed, he wrote four checks that were each in the amount of $9,900.00 made payable to "cash"—thereby apparently attempting, in his own mind, to fall below the $10,000.00 "radar screen." [Finding of

Fact No. 15]; *see Ratzlaf v. United States*, 510 U.S. 135, 136 (1994) (discussing federal law requirement that financial institutions file reports with the Secretary of the Treasury whenever they are involved in cash transactions exceeding $10,000.00). The Court is not convinced, without further evidence, that these Barclays credit card expenditures and cash withdrawals were also used for ordinary living expenses, as Greg Hawk testified. [*See* Findings of Fact Nos. 14 & 15]. Therefore, even if the ultimate disposition of Tejas Account funds had any legal significance, Greg Hawk has failed to sufficiently establish this ultimate disposition as to a significant quantity of the funds. He will be denied discharge under § 727(a)(2).

### B. Greg Hawk's omission of two significant transfers within 90 days of the Petition Date, and his failure to properly disclose the Tejas Account in his Schedules, constitutes a violation of § 727(a)(4).

Section 727(a)(4) denies discharge to a debtor who has "knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." Here, the Debtors made multiple false statements on their SOFA and Schedules. A false statement due to mere mistake is not sufficient to bar a discharge. *Matter of Beaubouef*, 966 F.2d 174, 178 (5th Cir. 1992). However, false statements made with "reckless indifference to the truth" may circumstantially establish the level of fraudulent intent necessary for a denial of discharge. *Id.* In *Beaubouef*, the debtor failed to disclose his interest in two companies on his original SOFA and amended SOFA, although he did disclose that he was an employee of one of the companies. *Id.* at 178. The debtor argued that he had not listed his interest in one company because he believed it to be "worthless" and had not listed his interest in the other company because it "did no business." *Id.* at 178–79. The Fifth Circuit rejected these arguments and affirmed the bankruptcy court's holding that "the existence of more than one falsehood" in an original and amended SOFA, when a life insurance application the debtor completed "just weeks before" the bankruptcy petition

evidenced his knowledge of the omitted interests, "constituted reckless indifference to the truth and, therefore, the requisite intent to deceive." *Id.* at 178.

Here, the Debtors' original SOFA, amended SOFA, original Schedule B, and amended Schedule B all contain falsehoods, which, under the circumstances of this case, the Court deems sufficient to establish Greg Hawk's reckless disregard for the truth rising to the level of fraudulent intent. First, both the original Schedule B and the amended Schedule B listed the Tejas Account in the wrong section. [Finding of Fact No. 7]. Greg Hawk testified that he used the Tejas Account as a personal account. *[Id.]*. The Court thus finds that his failure to list the Tejas Account in the "financial accounts" section of the Schedule B was done so knowingly. Greg Hawk offered no satisfactory justification for this mischaracterization. Further, the mischaracterization had significant consequences. Federal Rule of Bankruptcy Procedure 4002(b)(2)(B) requires individual debtors to provide, at the initial meeting of creditors, "statements for each of the debtor's depository and investment accounts." As the Tejas Account was not listed as one of the Debtors' accounts, the Debtors did not provide this information. Additionally, the Trustee testified that she did not examine the Tejas Account as a personal account of the Debtors because of the manner in which it was disclosed. [Testimony of Eva Engelhart, Feb. 17, 2015, at 9:33–9:34 a.m.].

Second, both the original and the amended SOFA omitted both the $5,000 loan repayment to Greg Hawk's brother and the $2,500 Barclays credit card payment from the Tejas Account. [Finding of Fact No. 22]. Greg Hawk testified that he wrote the check and made the credit card payment from the Tejas Account, indicating that these misstatements on the SOFA were knowing as well. [Findings of Fact Nos. 14, 20 & 21]. Greg Hawk's only justification for

these misrepresentations is that he might have "made a mistake." [Testimony of Greg Hawk, Feb. 17, 2015, at 11:15 a.m.].

Like the debtor in *Beaubouef*, Greg Hawk made multiple false statements on his SOFA and Schedules, including an amended SOFA and an amended Schedule B, without valid justification. Although Greg Hawk barely proffered an excuse for the false statements, the Court notes that his testimony was not particularly credible regardless. For example, when first asked what specific debt the $5,000 repaid, he testified that he could not remember; later, he responded by testifying as to unrelated items his brother had bought for him. [Finding of Fact No. 20]. Since it is unlikely these items totaled exactly $5,000, they offer a poor explanation for the $5,000 check.

In sum, like the debtor in *Beaubouef*, the fact that Greg Hawk knowingly made multiple false statements on his SOFAs and Schedules without justifiable excuse is sufficient to establish "reckless indifference to the truth" that establishes the "requisite intent to deceive." *See Beaubouef*, 966 F.2d at 178. For all these reasons, this Court concludes that Greg Hawk should be denied discharge pursuant to § 727(a)(4).

### C. The Debtors' failure to provide records detailing the liquidation of Homestake in 2007 is too remote to warrant denial of discharge under § 727(a)(3).

Section 727(a)(3) denies discharge to a debtor who has "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." The plaintiff bears the initial burden of proving that: (1) the debtor did not provide adequate records, and (2) the debtor's failure to do so made it impossible to assess his financial condition. *In re Duncan*, 562 F.3d 688, 697 (5th Cir. 2009). If the plaintiff meets this burden,

the debtor must establish that the failure to produce the records was justified under the circumstances in order to retain his right to a discharge. *Id.* Here, Res-TX has not met its burden of establishing that the Debtors failed to preserve adequate records, as the records Res-TX faults the Debtors for not producing are too remote in time.

The adequacy of a debtor's recordkeeping is relative to the debtor's sophistication and is determined on a case-by-case basis. *Id.* Relevant factors include the debtor's occupation, financial structure, education, and experience. *Id.* "A debtor's financial records need not contain full detail, but there should be written evidence of the debtor's financial condition." *Id.* (internal citations omitted). An individual debtor who owns or controls closely-held entities is obligated to keep adequate records for those entities. *Womble*, 289 B.R. at 857. The more control the individual debtor has over the businesses, and the more intertwined the debtor's personal and business transactions are, the more records the debtor is obligated to maintain. *Id.*

Nonetheless, debtors are not required to maintain financial records indefinitely. *In re Michael*, 433 B.R. 214, 221 (Bankr. N.D. Ohio 2010). The length of time for which a debtor must maintain records varies according to the type of debtor and the type of records. *Id.* at 222. The *Michael* court, after citing several cases enforcing a two-year time limit, excused the debtor's destruction of records four years before his bankruptcy filing. *Id.* at 221–22. Res-TX urges this Court to adopt a longer recordkeeping requirement, citing to *Michael* and *In re Self*, 325 B.R. 224 (Bankr. N.D. Ill. 2005). [Doc. No. 46, pp. 9–11].

However, Res-TX mischaracterizes these cases. In direct contradiction to Res-TX's assertion, the *Michael* court actually declined to apply § 727(a)(3) on the basis of the debtor's destruction of records four years prior to bankruptcy, but rather denied him discharge because of his subsequent inadequate recordkeeping during the four years *immediately* preceding the filing

of the debtor's Chapter 7 petition. 433 B.R. at 221–24. The court in *Michael* states that this inadequate recordkeeping extended from 2005 until the debtor filed for bankruptcy in 2009, *id.* at 223, so it does not support extending the recordkeeping requirement to "over four years before filing bankruptcy," as Res-TX contends. [Doc. No. 46, p. 10]. *Self*, similarly, imposes a recordkeeping requirement from the time the debtor received a lottery prize approximately two years before bankruptcy, 325 B.R. at 235, 242—not five years before bankruptcy, as Res-TX contends. [Doc. No. 46, p. 10].

Here, Res-TX seeks to bar the Debtors' discharge due to their failure to produce complete records from 2007 and 2008. Specifically, Res-TX faults the Debtors for not providing the Trustee with documentation by which she could trace the ultimate expenditure of $6,482,003.23 that had been transferred into holding companies owned by the Debtors by December 19, 2007. [Findings of Fact Nos. 18 & 19]. Res-TX additionally complains of the Debtors' failure to produce documentation establishing the ultimate distribution of the $251,000 that was transferred from Homestake on November 20, 2007. [*See* Finding of Fact No. 17]; [Doc. No. 46, p. 7].

Res-TX argues that despite the fact that the documentation it seeks would be dated approximately six years before the Petition Date of December 15, 2013, the Debtors should still be required to produce it because some of their companies did not file tax returns during the four years preceding the Petition Date. [Doc. No. 46, pp. 10–11]; [Testimony of Greg Hawk, Feb. 17, 2015, at 12:00–12:01 p.m.]; [*Id.* at 3:43–3:44 p.m.]; [Defs.' Ex. No. 48, p. 6]. Res-TX cites to IRS guidelines that instruct taxpayers who do not file taxes to maintain records "indefinitely." [Doc. No. 46, pp. 10–11]; *How Long Should I Keep Records?*, INTERNAL REVENUE SERV. (June 30, 2015), http://www.irs.gov/Businesses/Small-Businesses-&-Self-Employed/How-long-should-I-keep-records. However, these guidelines only establish that Greg Hawk should have

27

preserved records for those years during which his businesses did not file tax returns, i.e., possibly 2009 through 2012. Res-TX introduced no evidence that either Supreme or the captive insurance companies failed to file tax returns for 2007 or 2008; therefore, it has failed to establish that the Debtors were required to retain business records for those entities dating back that far. Typically, self-employed taxpayers are only required to keep records for three years. *How Long Should I Keep Records?*, INTERNAL REVENUE SERV. (June 30, 2015), http://www.irs.gov/Businesses/Small-Businesses-&-Self-Employed/How-long-should-I-keep-records.

It is neither necessary nor appropriate for this Court to establish a fixed time period for which debtors must maintain records, as "[t]he determination of what constitutes a reasonable period prior to the filing must be measured on a case-by-case basis, taking into account all of the circumstances of the case." *Self*, 325 B.R. at 241–42. The Court only holds that under the circumstances in this proceeding, where all of the relevant businesses were defunct more than three years before the Petition Date, [Findings of Fact Nos. 4, 5 & 17], and the disputed records were made approximately six years before the Petition Date, Res-TX has not established that the Debtors maintained insufficient records.

Res-TX's evidence that some of the Debtors' records were disorganized does not change this conclusion. [*See* Finding of Fact No. 18]. Res-TX does provide support for the proposition that "it is the debtor's duty to maintain and provide the court and the creditors with organized records of his financial affairs." *Self*, 325 B.R. at 241. However, logically this obligation applies only to those records that the debtor is obligated to maintain in the first place. Because the Trustee specified that she requested documents primarily relating to the liquidation of the captive insurance companies, [Finding of Fact No. 18], and because this Court has determined that these

records are too remote in time for the Debtors to be obligated to keep, the fact that those records that the Debtors did turn over in response to the Trustee's request were disorganized is not grounds for denial of discharge.

Res-TX also complains of "a lack of tax returns for the Hawks' business entities, including Supreme Builders, Ltd., the captive insurance companies, and Tejas." [Doc. No. 46, p. 9]. However, Res-TX did not introduce any evidence of the Debtors' failure to provide these documents to the Trustee. Indeed, there is no evidence that anyone requested these records. Given that the captive insurance companies were liquidated in 2007, [Finding of Fact No. 17], and that the evidence suggests that Supreme and Tejas were out of business by 2011, [Findings of Fact Nos. 4 & 5], the Court finds that the Debtors' failure to voluntarily produce tax returns for these entities is reasonable.

The most relevant documents not produced in this adversary proceeding, in this Court's view, are credit card statements for the Barclays credit card, to which the Debtors charged approximately $1,900 per month in the year prior to the Petition Date. [Finding of Fact No. 14]. Had Res-TX established that no Barclays credit card statements were produced at any time during the Debtors' bankruptcy, Res-TX might have made a *prima facie* case for denial of discharge under § 727(a)(3). *See Cadle Co. v. Terrell*, No. 4:01-CV-0399-E, 2002 WL 22075, at *5 (N.D. Tex. Jan. 7, 2002), *aff'd sub nom. In re Terrell*, 46 F. App'x 731 (5th Cir. 2002) ("While bank statements and credit card receipts or monthly statements may be simple records, they 'form the core' of what creditors would need to ascertain [the debtor's] financial condition, primarily his use of cash assets . . . ."); *see also In re Hobbs*, 333 B.R. 751 (Bankr. N.D. Tex. 2005) (denying the debtor a discharge for not producing credit card or bank statements).

Here, payments on the Barclays card from the Tejas Account totaled $23,238.12 in the year leading up to the Petition Date, amounting to an average of $1,900 monthly. [Finding of Fact No. 14]. These payments constitute significant expenditures, and thus to ascertain the Debtors' financial condition, it would be necessary to explore in more detail just exactly how these cash assets were used. However, at trial, the Trustee never testified as to whether Barclays credit card statements had been produced outside of this adversary proceeding, nor did Res-TX provide any other evidence that they were not produced during the Debtors' bankruptcy.

Therefore, Res-TX has failed to meet its burden of proof in establishing that the Debtors' records are inadequate or that the Trustee has been unable to construct an accurate picture of the Debtors' *recent* financial affairs. Consequently, it is unnecessary for this Court to address the second step in the § 727(a)(3) analysis, i.e. whether the Debtors have rebutted the presumption of inadequacy. *See Duncan*, 562 F.3d at 697. For these reasons, the Debtors' discharge will not be denied on the basis of § 727(a)(3).

### D. The Debtors have sufficiently explained the disposition of funds from their captive insurance companies to avoid a denial of discharge under § 727(a)(5).

Section 727(a)(5) denies discharge to a debtor who has "failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets." Section 727(a)(5) does not impose denial of discharge on a debtor simply because, at some point, the debtor failed to adequately respond to a question about the disposition of assets. Instead, § 727(a)(5) gives debtors ample opportunity to correct such a failure, specifying that debtors are not denied discharge under the provision as long as they "explain [the loss of assets] satisfactorily, *before determination of denial of discharge*." (emphasis added).

Res-TX urges this Court to deny discharge under § 727(a)(5) because the Debtors have failed to explain the disposition of the funds liquidated from the captive insurance companies.

[Finding of Fact No. 19]. In the Objection, Res-TX contends that the Debtors have failed to explain the ultimate disposition of the $6,482,003.23 that was liquidated from Homestake. [Doc. No. 23, ¶¶ 13 & 18]. In its post-trial brief, Res-TX shifts focus, only arguing that the Debtors should be denied discharge because they failed to sufficiently explain the disposition of the $251,000 transferred from Homestake's bank account on November 20, 2007. [Doc. No. 46, pp. 14–16]; [Testimony of Eva Engelhart, Feb. 17, 2015, at 9:29 a.m.]. Yet, there is nothing in the record to indicate that the Trustee ever requested an explanation for the disposition of the $251,000.

The Debtors have sufficiently established that the $6,482,003.23 liquidated from Homestake was ultimately paid back into Supreme as a capital contribution. [Finding of Fact No. 19]; [Defs.' Ex. No. 19]. The Court finds that given that this liquidation took place approximately six years before the Petition Date, the Debtors are not required to further explain the disposition of the assets from Supreme. As with § 727(a)(3), it would be absurd to apply § 727(a)(5) without some time limit before which debtors are excused from some failures of proof and memory. Under these circumstances, the fact that Supreme was undergoing financial difficulties when the cash infusions occurred and the fact that these financial difficulties continued until Supreme eventually ceased operating sufficiently explain the disposition of the assets. [*See* Findings of Fact Nos. 4 & 19].

The transfer of the $251,000 on November 20, 2007 is even more remote than the transfer of the $6,482,003.23 by December 19, 2007. [*See* Finding of Fact No. 17]. Unlike the $6,482,003.23 transfer, the $251,000 transfer clearly occurred more than six years before the Petition Date of December 15, 2013, and thus it is even more clearly out of the purview of §

727(a)(5). The reason for this is that six years is the time frame about which the debtor's business history is inquired in section 18 of the SOFA, which reads:

> If the debtor is an individual, list the names, addresses, taxpayer-identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full-time or part-time within SIX YEARS immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities, within SIX YEARS immediately preceding the commencement of this case.

[Doc. No. 19, p. 7]; [Doc. No. 30, p. 7].

Seeing as the Debtors were not even required to disclose any business interests older than six years on their SOFA, this Court will not hold that they were required to provide a detailed description of one their business's activities more than six years ago that they were not even asked to explain. For these reasons, the Debtors shall not be denied a discharge pursuant to § 727(a)(5).

### E. The evidence is not sufficient to establish that Marcie Hawk had fraudulent intent.

Although not all subsections of § 727 require a showing of fraudulent intent, both sections under which Res-TX has made a sufficient showing as to Greg Hawk do. Specifically, § 727(a)(2) and § 727(a)(4) require showings of fraudulent intent, while § 727(a)(3) and § 727(a)(5) do not. Intent of each spouse must be shown separately, and may not be attributed from spouse to spouse. *Reed*, 700 F.2d at 993. Furthermore, for intent to be imputed through agency principles, "it is not enough that debtors are spouses; a business relationship between the spouses must exist." *In re Kerry*, No. 09-80766, 2012 WL 1865451, at *13 (Bankr. W.D. La. May 22, 2012) (internal quotation omitted) (citing *Matter of Allison*, 960 F.2d 481, 485–86 (5th Cir. 1992)). In *Allison*, a case disputing discharge of a specific debt under § 523, the husband made a fraudulent representation during a closing on residential property that he and his wife

32

were purchasing. 960 F.2d at 483–84. The Fifth Circuit relied on the husband's fraudulent intent to deny his discharge as to the seller, but refused to impute fraudulent intent to the wife, who had not attended the closing. *Id.* The Fifth Circuit reasoned that "[t]he agency theory has been applied to impute the fraudulent acts of one spouse to the other in cases in which the other spouse was involved in a business or scheme." *Id.* Noting the "statutory requirement for fraud involving moral turpitude or intentional wrong," the Fifth Circuit allowed discharge for the wife since there was no evidence linking her to the fraudulent acts of her husband. *Id.*

In *Kerry*, the plaintiff argued that "the division of responsibilities in the [debtors'] former . . . household and marriage were such that [the husband] made [the wife] agent in fact . . . , pointing to the fact that [the wife] paid all the household bills, made all purchasing and vacation arrangements and deposited all of [the husband's] paychecks." 2012 WL 1865451, at *13. The court rejected this reasoning, relying on *Allison* to hold that fraudulent intent would not be imputed between the debtor husband and his wife absent a business relationship. *Id.*

Reviewing the evidence in regard to Marcie Hawk, the Court finds that Res-TX has not established the requisite intent to defraud under either § 727(a)(2) or § 727(a)(4). Nor has Res-TX shown that Marcie Hawk was sufficiently involved in Greg Hawk's business activities to create an agency relationship on account of which fraudulent intent could be imputed from Greg Hawk to Marcie Hawk. Instead, the agency theory with which this case best fits is the theory rejected in *Kerry*: that the division of household responsibilities created an agency relationship. To accept such a theory would be to *de facto* allow an agency relationship to be inferred from the marital relationship itself, which the Fifth Circuit has repeatedly rejected. *See Allison*, 960 F.2d at 485–486; *Reed*, 700 F.2d at 993. Instead, debtors are entitled to rely on their spouses to handle personal financial matters without fear of losing their right to a fresh start in bankruptcy.

*See In re Coven*, 2006 WL 2385423, at *12, 14 (Bankr. D.N.J. Aug. 17, 2006), *aff'd*, 2007 WL 1160332 (D.N.J. Apr. 17, 2007) (granting a spouse's discharge over a § 727 challenge because she "was a loyal spouse first, and cannot be blamed for being deceived by her husband," and because denial of discharge "is an extreme remedy that should not be taken lightly, and its application should be construed liberally in favor of the debtor.").

Here, Res-TX has failed to show that Marcie Hawk should be denied discharge under either § 727(a)(2), relating to the liquidation of her IRA, or under § 727(a)(4), relating to the two falsehoods on the SOFA and the one on the Schedule B.

As an initial matter, the Court notes that the liquidation of Marcie Hawk's IRA occurred more than one year before the Petition Date. Specifically, it occurred on October 10, 2012, with the Petition Date being December 15, 2013. [Finding of Fact No. 12]. Hence, Res-TX cannot satisfy a necessary element required under § 727(a)(2). However, even assuming that this transfer could be the basis of a § 727(a)(2) denial of discharge under the doctrine of "continuing concealment,"[7] Res-TX has not shown that Marcie Hawk had the requisite fraudulent intent.

Unlike Greg Hawk, Marcie Hawk did not "practically admit" to fraudulent intent by testifying that she used the Tejas Account for the purpose of preventing attachment by creditors. [*Compare* Finding of Fact No. 11 to Finding of Fact No. 12]. Instead, Marcie Hawk testified that she liquidated her IRA into the Tejas Account at Greg Hawk's direction, because she trusted Greg Hawk to manage the couple's financial affairs. [*Id.*]. This Court finds Marcie Hawk's testimony credible, and she simply did not admit to having the intent to hinder creditors, as Greg Hawk did.

---

[7] *See Self*, 325 B.R. at 238 ("[W]here property is transferred more than one year before bankruptcy, a discharge may nonetheless be denied if the concealment of any retained interest in that property continues into the statutory one-year period, coupled with the requisite intent.") (internal quotation omitted).

Furthermore, application of the *Dennis* factors establishes that Res-TX has failed to satisfy its burden of proof as to Marcie Hawk. One important factor does not apply to Marcie Hawk at all: unlike Greg Hawk, there is no evidence that she had control over the Tejas Account. A second factor—that Tejas was nominally owned by close relatives—weighs much more heavily as to Greg Hawk than as to Marcie Hawk, as the Tejas Account belonged to the company owned by his parents, not hers. [Findings of Fact. Nos. 6 & 7]. A third factor—that there was no consideration for the transfer—bears significantly less weight as to Marcie Hawk because, according to her credible testimony, she understood only that her IRA was being liquidated "into an account that Greg would use to pay our bills." [Testimony of Marcie Hawk, Feb. 17, 2015, at 2:52 p.m.]. The remaining two factors—that the Hawks were suffering financially at the time of the transfer and that creditors were already garnishing their assets—are not alone sufficient to condemn Marcie Hawk.

Additionally, Res-TX has not shown that Marcie Hawk had fraudulent intent in making the false statements on the SOFA and Schedule B that disqualify Greg Hawk from a discharge under § 727(a)(4). The evidence shows that only Greg Hawk had access to the Tejas Account, [Findings of Fact Nos. 6, 7, 13 & 14]; there is no evidence that Marcie Hawk had knowledge of the payments to Greg Hawk's brother and to Barclays from the Tejas Account that were not disclosed on the SOFA. Likewise, since Greg Hawk managed the Tejas Account, his knowledge that it should have been listed in the proper section of the Schedule B can be assumed, while such knowledge cannot be assumed for Marcie Hawk. Consequently, the fact that Marcie Hawk signed off on the SOFA and Schedules containing these errors does not evidence the same disregard for truth as to her that it does as to Greg Hawk.

Finally, Res-TX has not established that Marcie Hawk was in business with Greg Hawk in order to establish imputed fraudulent intent as to either § 727(a)(2) or § 727(a)(4). While Marcie Hawk was listed as the "president" of BuildersRisk and as a "director" of Homestake, there is no evidence that her involvement was more than nominal, and both companies were liquidated by 2007. [Findings of Fact Nos. 16 & 17]. As to Greg Hawk's primary business, Supreme, Marcie Hawk credibly testified that her participation was minimal. [Finding of Fact No. 13]. Though she would occasionally help Greg Hawk stage homes for showing, she never worked in the Supreme office, she never made any financial decisions regarding Supreme, and she was never an officer or director of Supreme. [*Id.*]. Most relevant to the actual transactions which form the basis of Res-TX's objections under § 727(a)(2) and § 727(a)(4), there is no evidence that Marcie Hawk had any control over the Tejas Account or any business interest in Tejas. Thus, Res-TX has failed to establish that Greg Hawk's fraudulent intent with regard to either the transfers to the Tejas Account or the false statements on the SOFA and Schedules can be imputed to Marcie Hawk.

For all of these reasons, Marcie Hawk will not be denied discharge under either § 727(a)(2) or § 727(a)(4).

## VII.    CONCLUSION

For the foregoing reasons, Greg Hawk is denied a discharge under § 727(a)(2), or, alternatively, under § 727(a)(4)—but not under § 727(a)(3) or (a)(5), as Res-TX has failed to satisfy its burden of proof under these last two subsections. As to Marcie Hawk, Res-TX has failed to meet its burden of proof entirely, and as fraudulent intent cannot be imputed from one spouse to the other spouse, Res-TX's objection to Marcie Hawk's discharge will be overruled. She will therefore receive her discharge.

A judgment consistent with this Memorandum Opinion is entered simultaneously herewith.


Signed on this 23rd day of July, 2015.

Jeff Bohm
United States Bankruptcy Judge